(No. 4643-

PAUL FREGA AND REINHARDT FREGA, CO-PARTNERS, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed October 26, 1956.*

LATHROP J. HUNT, Attorney for Claimants.

LATHAM CASTLE, Attorney General; MARION G. TIERNAN, Assistant Attorney General, for Respondent.

WHAM, J.

Claimants in this case are truck farmers, in the vicinity of St. Charles, Illinois, and are engaged in raising vegetables, which are sold on the Chicago market. They claim damages arising out of spraying operations, which were conducted by the State of Illinois, Division of Highways, along the highway bordering their field. They allege in their complaint that respondent, while engaged in spraying weeds along the right-of-way on September 1, 1954, negligently sprayed a chemical onto their growing vegetable crop, damaging claimants in the amount of $2,520.00. Respondent contends that the spray used was neither poisonous for human consumption nor detrimental to crops, which had matured at the time of application.

We have considered the record in this case, and find that claimants have borne the burden of proving that respondent's agents were negligent in so operating the spray rig that a portion of claimants' vegetable crop was subjected to whatever effect the chemical has upon vegetables. We do not deem it necessary to analyze the evidence on this point, but will confine our discussion to what we believe to be the primary question involved, namely, what damage, if any, proximately resulted from the negligent spraying operations. It is fundamental that the burden of proving this element is upon claimants. The proof required to establish damages must not be remote, speculative nor uncertain.

The measure of damages to growing, immatured crops is the value of the crop as it was when destroyed. This is determinable by ascertaining the amount of the

matured crop affected and its market value, and deducting therefrom the necessary cost of cultivation, harvesting and marketing of the crop.

The spray involved was a weed killing compound containing a substance known as 2, 4-D acid. Respondent's witness, William J. Champion, Vice-President of the Riverdale Chemical Company, who qualified as an expert chemist familiar with this particular spray, described the effect of the spray as a selective weed killer that kills broad leaved plants through hormone action, which affects the growing system of the plant. He further testified that the spray was non-poisonous, would not render the vegetables inedible, and would have no effect upon matured vegetables, but would, however, affect the growth of non-matured vegetables, if applied to the plant during the period of growth.

Both claimants testified as to the types and amounts of vegetables upon the land sprayed. Their testimony, however, leaves much to be desired, since it was based to a considerable extent upon guess, speculation and surmise.

Mr. Reinhardt Frega stated at one point that the bean plants, which were sprayed, were killed, and the beans at the time of the spraying were a week from becoming mature. At another point in his testimony, however, he stated that there were no beans on the plants at the time of the spraying. He also stated that one-third of the plants were completely killed off. Mr. Paul Frega testified that some beans in the affected area later developed partly, but were crooked. He stated that no attempt was made to dispose of the beans, which did develop.

Respondent's witness, Richard Kress, landscape engineer with the Illinois Division of Highways, Elgin District, testified claimants called his office in the evening of

the day the spraying took place, complained, and requested that state personnel inspect the crops. An inspection was made the next day, and a report made to Mr. Kress, who then visited claimants' land five days later.

While on the land, he was conducted on an inspection tour by one of the claimants. He asked claimants what was the trouble, and was told that claimants were afraid to sell the crops, because they were poisoned. Mr. Kress informed claimants that the spray was not poisonous, and demonstrated this fact by eating a piece of cabbage leaf that had been sprayed. He stated that he observed the condition of the bean plants, and that at one end of the field some of the plants were not doing well, but looked to him as though there had been erosion. He further stated the beans looked normal to him, as did the leaves on the plants.

Mr. Reinhardt Frega testified with respect to the amount of beans affected. There were 18 rows of beans, 390 to 400 feet in length, in one field, which he thought should have produced 100 bushels in three pickings; there were 20 rows of beans in another field, 240 to 335 feet in length, which the witness said he couldn't say exactly how much the yield would have been. He did, however, in answer to a leading question say, with reservation, 180 bushels. When recalled as a witness on rebuttal, he stated, in answer to a question of what percentage of the bean plants were destroyed, that one-third of the plants in each of the fields were destroyed.

With respect to the other crops, the testimony was more indefinite and speculative with respect to the amount of crops damaged. Mr. Reinhardt Frega testified that, out of 18 rows of cucumbers, 16 had been picked, some before and some after the spraying. He admitted he had no idea

as to the number of cucumber plants in the patch. With respect to cabbages and cauliflower, his testimony was so general that we cannot determine the extent of the damage to these crops. He stated that three-fourths of the cabbages were ready to be picked at the time of the spraying, but the cauliflower was not. With respect to tomatoes, he testified they had been partly picked. He stated that there was one-third of the crop left when the spraying occurred. He did not state the degree of maturity of these tomatoes.

It is most difficult to determine from the evidence offered by claimants in this case just how extensive the damage to their crop was. Although there is no question but what some of the spray came upon their land, we cannot believe that the entire crop was saturated with the spray from the evidence offered in this case. Claimants testimony is not definite, and in many instances amounts to pure guess and surmise.

With respect to the claim for damage to the cucumbers, cabbages, cauliflower and tomatoes, we do not consider the evidence sufficient to establish a considerable loss for two reasons. First, with respect to the portion of those crops that were matured, the only evidence on the point establishes that the spray would not adversely affect matured crops. No attempt was made by claimants to offer any evidence to the contrary, nor does the evidence reflect an attempt by claimants to market the vegetables. Second, as we have said before, the evidence is much too speculative with respect to the extent of damages to provide any basis for us to properly arrive at a justifiable conclusion.

It is only with respect to the beans that we feel the evidence is sufficient to allow us to draw legitimate in-

ferences and conclusions, which will support an award in an ascertainable amount of money.

The evidence established that the beans were immature, and upon respondent's testimony could definitely be affected by an application of the spray. Although the evidence as to the amount of damage is sketchy and to some extent conflicting, we believe it to be sufficient to establish by a slight preponderance that one-third of the potential bean crop was destroyed. This, from the most favorable standpoint to claimants, amounts to approximately 93 bushels.

The evidence established that the price of beans was $5.50 per bushel at the time they would have been sold, making a total of $511.50. From this amount must be deducted the cost of cultivating, harvesting and marketing the crop. The evidence on this point is likewise so unsatisfactory that no definite amount can be ascertained. The only evidence on this point was brought forth by respondent on cross-examination, which established that baskets cost 22¢ each, and the labor would have been performed, and the crops transported by claimants themselves.

It is difficult for us to arrive at a proper amount to deduct from the market price of the beans, but believe at the least that the cost of cultivating, marketing and transporting the 93 bushels could not have been less than $1.00 per bushel.

Therefore, we believe that, although much is left to be desired in the proof of this case, the claim should be allowed in the sum of $418.50.